Good morning, Your Honors. May it please the Court. I'd like to reserve two minutes for rebuttal. Your Honors, three significant developments have occurred since the District Court's decision in this case that highlight the need for reversal here. The first is U.S. Supreme Court's decision in Animal Science. The second is this Circuit's decision in the Kyle Bell case. And then the third is that the statute of limitations has run for the Spanish proceeding that was at issue in the District Court below. Your Honor, with respect to Animal Science, it was not a 1782 decision, but of course 1782 expressly protects privileges, legally recognized privileges. And the Supreme Court mandated in Animal Science that courts must accord respectful consideration to the views of foreign sovereigns interpreting their own laws. And that that deference is a key component of international comity. Spain's views here are entitled to substantial weight. And there's no dispute that the District Court here refused to accord any deference to Spain's views in this case. Could you talk about the finality of the judgment here? Absolutely, Your Honor. There was a decision by the District Court in October and we filed our notice of appeal a couple of days later. That did not resolve all of the work product issues that the District Court subsequently resolved in December. Nevertheless, the October order is final under this Court's interpretation of finality in the 1782 realm. And if you look at the Seventh Circuit's recent decision... Yes, the District Court resolved those in the December order. And we, in light of the other side's brief, we've specifically withdrew our point for an argument from our opening brief. So that issue is not before you at this point in time. But finality from the Court's October order, Your Honor, is the Biomet decision from the Seventh Circuit earlier this year addressed exactly this scenario, where there were ongoing proceedings in the District Court after a ruling on 1782 and the Court said, that's okay, there's still finality here for purposes of appellate jurisdiction. I'm sorry, Your Honor. I'm just a little bit misunderstanding. If we entertain this appeal now, isn't there, given what you've just said, a distinct possibility that there will be another appeal involving the work product issues that have now been resolved at a later point? Well, Your Honor, this is the problem that the Biomet Court wrestled with, and it said, yes, there is the prospect for seriatim appeals, but the problem is knowing when you have to appeal. I mean, for instance, if we had not appealed when we did, and we're simply waiting for the District Court to conclude, like the District Court could issue an order tomorrow if there was a dispute about our compliance with his orders. The problem is if we wait until that point in time, we're going to blow the deadline, which is exactly what the Seventh Circuit held in Biomet. So we filed as soon as reasonably possible. Even if you said that order is not sufficiently final, at some point it ripens into a final judgment for purposes of 1782. And there have been no ongoing proceedings in the District Court in the last several months. So, again, like I don't know what we would wait for in that scenario. Your Honors, particularly in light of Kyle Bell and Animal Science, the decision, Kyle Bell addressed a very similar scenario where the court rejected the use of 1782 petition against a U.S. law firm to produce documents received in its capacity as counsel for a foreign client, which is the same scenario that we have in this case, because the real party from whom the documents were sought was the foreign client. The District Court, if I understand correctly, the District Court, I think, did not address the issue of privileges. That's correct. The court, relying on Uromipa, said we're not going to get into that area. And this is error in several respects. First of all, in light of Animal Science, it's error. But second of all, at the same time that the District Court said we're not going to get into that because of Uromipa, it relies on the other side's expert on description of Spanish law. So it is wading into that thicket. Are you suggesting that we should remand to the District Court and say consider the privileges issue? Give us a decision on foreign privileges? Your Honor, that's one scenario, obviously. We would submit that in light of the intervening authority, not only with Animal Science, but with Kyobel, that an outright reversal is appropriate. And that's more pronounced by the fact that the statute of limitations has expired for the Spanish proceedings. So remember, there were two proceedings that they wanted to undertake. One was the Spanish proceedings, the criminal proceedings. The second was European Court of Human Rights. The first one, the statute of limitations, has expired. So it's not, in terms of the for-use requirement, it cannot be used in this proceeding anymore because the statute has run. Why couldn't some of the information be used in the European proceedings? Use doesn't mean actually offering it, does it? Can it be used in the context of drafting a complaint or structuring the litigation strategy? That's correct, Your Honor. But what we would say on that is the way that they frame what they want, what they want for the European Court of Human Rights is the Cushing documentation, not the documentation related to these three witnesses. And they said that if that did substantiate some type of perjury, then maybe they would file another petition in front of the European Court of Human Rights. That petition would be now time-barred under the European procedures. But secondly, obviously, if they believed they had the smoking gun that would substantiate perjury, they would have filed their proceedings in Spain. They didn't do that. But if at the time that the district court made the award, the time for filing the Carrella proceeding in Spain had not expired, the district court's judgment was based on a circumstance where it was still possible. So you're saying that we should now sort of undertake it ab initio and say, well, we're going to supplement, we're going to take into account new facts that were not the facts of record at the time of the district court's decision to say it wasn't for use in a foreign proceeding when it might well have been? And, Your Honor, I would say yes. And the reason for that is the court, this court in Nice, recognized that there was a change in circumstances in that case from the time of the district court's order to the time that the case was on appeal. And the court, I'm sorry, Your Honor. No, no. Go ahead and finish, Jeff. And the court indicated that there, now it did remand in that case for further consideration, but here the remand, as I said, would be unnecessary on the Spanish criminal proceeding side because there is no possibility that they could commence that proceeding at this point in time. Do you see our decision in URAMEPA as in conflict with animal science? Your Honor, it depends how broadly you read URAMEPA. I think that it is. URAMEPA is pretty clear. It says unless it's really, really clear, you go ahead and you allow the discovery. And, Your Honor, what I would say on that is this Court's decision in KPMG, there was a footnote where it seemed to limit URAMEPA to admissibility, like evidentiary admissibility issues. URAMEPA was not dealing with a privilege question. And so I think you take ---- I'm going to mispronounce this, but what about Mettel-Gelschloff, or however you pronounce that? I've got a clerk who speaks German, and I just, I'm sure she's grating her teeth right now. I speak butchered French, Your Honor, so. But I think that that's where also Kiobel comes in because Kiobel said that we need to look at whether the documents are undiscoverable from the client abroad. Sure. And that necessarily means ---- Right, and there's, I mean, the Supreme Court long ago recognized that there are, a privilege in the hands of the client is privileged, equally privileged in the hands of his or her attorney. Exactly, exactly. So, but URAMEPA kind of counsels against, absent being certain that it is privileged, allowing the foreign court to ultimately make that, quote, difficult foreign law decision. Right. And I think that when interpreted in light of Kiobel and animal science, and particularly in light of the fact that this is a privilege question, we don't have to go so far to say URAMEPA has been overruled. But when this is a privilege question, which was not at issue in URAMEPA, and because that is statutory, we believe that the analysis is appropriate to consider what is, you know, what does this statute provide. And then to your second point about, well, it's pretty clear. I mean, here we have statutes in Spain that say, you know, they explain the expanse of the privilege. And we provided an expert declaration on this, and we provided the views of the Spanish government. The Court put the burden on you to establish the existence of privilege, right? That's fair, Your Honor. Kiobel is pretty clear that the provisions of 1782 are jurisdictional, isn't it? The use provision? Yes, Your Honor. So then, in essence, it's flipped. The traditional jurisdictional pleading requirements are is that the person asserting jurisdiction pleads jurisdiction and has the burden on it, right? That's usually correct, Your Honor. Yeah. And so one would think that the use factor would require the person asserting the jurisdiction of the Court to plead that it was free of privilege and therefore discoverable. Your Honor, certainly we would not disagree with that interpretation. I mean, I think the point is, whoever has the burden, the Court ultimately did not consider the privilege issue and did not consider the views of the Spanish government. Could you address a number of district courts in this circuit, as you're aware, have applied the touch base analysis, which, as far as I can tell, we haven't discussed in this context. But looking at that analysis, it seems to me that, this is a pretty strong argument, that there is no privilege here. Documents in the hands of an American law firm, documents in the hands of expert witness located in America for use in the United States. So am I wrong about how the touch base analysis would apply? Well, we would disagree that the touch base analysis does apply here because the touch base analysis is not designed for 1782 privilege determination. It's more a generic choice of law issue. And particularly in light of Kiobel, we believe that when the Court says we need to look at whether these documents are undiscoverable abroad, you have to get into this analysis. The district court, of course, never engaged. Kiobel actually wasn't about a circumstance where documents are sent into the United States where counsel is retained in the United States for a U.S. litigation. I'm sorry, Your Honor? Kiobel wasn't about a circumstance where a U.S. counsel is retained for use in a litigation to be commenced in the United States. Your Honor, but they were covered ultimately by a protective order in the United States. And so I'm not sure that that's ultimately material at the end of the day. The district court here never engaged in the touch base analysis. And so this is, you know, this is their effort to defend his decision on a grounds that the Court did not rely upon. Fair enough. Your Honor, unless you have further questions, we respectfully request reversal. Thank you. May it please the Court, my name is Thomas Tisdale of the Tisdale Law Offices. We are counsel for the appellee, Captain Apostolos Mangouras. After a change of circumstances and at the invitation of this Court in a 2014 opinion, we filed the 1782 renewed application seeking discovery from Squire Patton Boggs. We also filed a second application seeking discovery from an expert retained for the U.S. proceedings, Charles Cushing. We cannot and should not cross those two because some of these issues are distinctive to those each application is different. However, the district court, Judge Costell, properly reviewed and analyzed the changed circumstances, applied the mandatory factors in 1782, and properly exercised his discretion as utilizing the test set forth in Intel. But didn't the district court err in not examining whether there was a legally applicable privilege for the purposes of the statute? With all due respect, Your Honor, no, I don't believe he erred in doing so. I think he properly deferred that question on the basis that there was no authoritative evidence provided on the foreign law. Why do we impose that standard, Rule 44.1 of the Civil Rules of Procedure, say that matters of foreign law are matters for the court to take testimony on or get proof on and that it's ultimately an issue of law and animal science tells us that courts do this all the time and that just because a country tells us what its law is, particularly if the country benefits it. I was on the animal science panel that was appealed and was reversed by the Supreme Court. I'm familiar with it. So I don't understand. I have a hard time understanding the structural underpinnings of URAMEPA. URAMEPA, just throw your hands up, and unless you're absolutely certain we allow total discovery. What does that do to the privilege that's enjoyed by an individual who gives his or her documents to a U.S. counsel? Those documents now in the United States are free and open for discovery, even though they're privileged in the form where they might be offered? I think Your Honor is actually utilizing the fact pattern in the Kyobel case, which is very distinct. Yeah. I sat on that one, too. Very distinct and different from the fact pattern in this case, because none of the documents we sought are documents provided by the government of Spain. All the documents which we sought are documents we sought. But a privilege is asserted. The privilege of Spain. Oh, and so the question is the U.S. courts, Federal courts all the time decide what foreign law is. Actions are brought in the Southern District with regard to foreign contracts that are governed by foreign law, and the able judges of the Southern District and the Eastern District regularly decide what the foreign law is. Why is it all of a sudden in 1782, unless it's absolutely crystal clear, slap me across the face, I know what the law is, I throw up my hands and say let them look at it? I don't understand why. Well, because as the Court has, as the decisions have determined over time, authoritative proof of what that foreign law would be is what's required. And it's required so as to satisfy the twin aims of 1782. Because if we go through all of that effort, we are going to be sitting effectively in place of the foreign forum instead of the U.S. court. That's exactly what we do when we apply German law to German contracts in the Southern District and enforce the rights that were negotiated in German commercial activity. I agree with you. So how is that any different? Because that's you're determining those, sir, on the merits, whereas this is just a discovery dispute. And it's up to the foreign ---- What does Rule 44 tell me to do with regard to foreign law, but decided on the merits? The foreign forum has the ultimate say as to whether or not to accept that evidence, reject that evidence, handle that evidence howsoever it chooses. And that's the ---- that's essentially the difference between 1782 and any other application of foreign law, because we are not the Court determining the merits of the dispute. We are the Court just handling the discovery dispute. And the ultimate disposition as to whether or not that evidence can be used should be in the hands of the foreign court. In this particular case, if Spain does not want ---- Then why did Congress put the word use in there? Well, I ---- your ---- the question which arises deals only with the question of privilege. And not every country has a secrecy law like Spain does where every document, regardless of where it's ---- where it is obtained from, whatever the source, third party or otherwise, if it's in the hands of an attorney representing a Spaniard, it is privileged, regardless of where it's come from. Now, if that is, in fact, the law, and we obtain that ---- and we obtain that information and we obtain that discovery and we attempt to use that in the court of criminal or in the European Court of Human Rights, that court, the ultimate ---- the court ultimately deciding the merits of the case has the ultimate decision as to whether or not to accept that discovery. But if you learn information from it that you then use alternatively with regard to how you craft your pleading and do other things, you have the benefit of it and the privilege is extinguished in any event. I believe, as Judge Costell said, if we continue to pursue ---- well, I would argue, first of all, that we are talking about a privilege which should not be applied in any event based upon the touch-base test, that 1782 must incorporate the touch-base test. Otherwise, we change the statute from being any legally applicable privilege to being any conceivable privilege anywhere in the world. Because if we use the touch-base test, in this case, Spanish secrecy law does not apply. So the idea of the touch-base test is using that test is what gives meaning to whether the privilege is legally applicable. That's correct. It's legally applicable if you touch base. Correct. If you touch base, now you are the legally applicable privilege. However, if we just open this up to any conceivable privilege, then, in fact, we have just done a terrible injustice to 1782 and its twin aims. What should be accomplished is the utilization of the touch-base test so that we know which privilege, if any, applies to the particular documents in question. In this particular case, the touch base is the United States. These are documents in the hands of U.S. attorneys or U.S. experts which were gathered during the course of U.S. litigation, which were obtained from third-party witnesses in various places in the United States or around the world, never Spain. So we have Mr. Alavizos, who's a Greek, Mr. Costazos, who's a Greek, and Mr. Tussens, who's Dutch, I believe. The documents were not created or prepared for use in the Spanish litigation. They were prepared for use in this court. What does 1782 say? It says for use in the foreign litigation. Why would you make a privilege analysis for use in the U.S. court when the question is use in a foreign court? I don't understand how touch base makes perfect sense to me if you're going to litigate in the SCNY. But how does touch base have any relevance to the statutory language Congress imposed, use in the foreign court? You've abrogated, you've completely abrogated the existence of the privilege. If you're going to use it in a foreign court, you've taken use right out of the statute. All due respect, Your Honor, I don't believe you have. I don't think that we have to incorporate all of the conceivable foreign law in that particular instance. That's not what we're being called upon to do. We're called upon to utilize. Let me tell you an interesting thing if we follow URAMEPA then. In URAMEPA, the documents are discoverable, right? I'm sorry. Under URAMEPA, you would be entitled to the documents being discoverable in the absence of your opponent being able to establish that they're privileged in some way, correct? Correct. All right. And then you go to the Spanish court, you can't use them. That is a distinct possibility under any circumstance, privilege or otherwise. What would you say about our remanding to the district court to give a decision on privilege issues? Well, first of all, I believe if the court is not going to affirm, then that is the only appropriate remedy insofar as that issue is concerned, that it is a remand. It's not a reversal because it's left up to the district court then to weigh, first of all, to establish whether or not one thing touches base with the case touches base with the United States or it touches base with Spain. And then even if it does touch base with Spain, what does Spanish privilege provide? Because there are conflicting affidavits. There are 13 affidavits, so it's not as if this issue was not before the district court. There are 13 different affidavits addressing Spanish privilege law. And in this particular case, that would, if it is remanded, then the district court can make the ultimate determination as to whether or not touch base calls for U.S. law and Spanish law, or if Spanish law, what Spanish law provides. However, I do believe that the Uramipa case is properly employed in that particular setting because the ultimate disposition is up to the court in Spain or the European Court of Human Rights to determine whether or not to take the evidence. Doesn't 1782 say any legally applicable privilege? Yes, sir. Why would you do a touch base test? Because you have to determine what that legally applicable privilege is. Any legally applicable privilege. So wouldn't the Spanish privilege be relevant in the court's determination under 1782? I don't believe so, Your Honor. I think at some point you have to make a determination. Any legally applicable privilege. Well, but with all due respect to Your Honor, if you say any ---- Every time I hear you say, I do respect, I hear something entirely different. So you don't have to say that. I appreciate it, Your Honor. I think if the statute said any privilege. Any legally ---- Any privilege, but it says any legally applicable privilege. The question is what is ---- You want a choice of law provision saying, well, if it's discoverable in New York because the documents are here, then we decide whether the privilege here, notwithstanding that there is a legal privilege recognized in Spain and it would not be admissible in Spain, right? That's what your touch base test would do. Our touch base test would do just that, Your Honor. Yes. So it would not be any legally applicable privilege. Your touch base test says it's discoverable if the significant contacts are with New York and, therefore, you apply federal law with regard to the discoverability. I think the way Your Honor is reading it, it would be interpreted as being any privilege, any arguable privilege. I think any applicable, legally applicable privilege requires an analysis as to what constitutes the legally applicable privilege, not just any arguable privilege. Well, in Spain, I would think you'd want to know whether it was privileged in Spain or not, whether it was going to be admissible or not. And, in fact, we have submitted affidavits to the contrary to that effect, Your Honor. I know. Yes. So, all right. I'm just suggesting I'm having a hard time understanding a common law test with clear language in a congressionally passed statute. The ---- You would draw a distinction, and I'm trying to understand what legally applicable privilege means, but you would draw a distinction between a case in which an American firm is retained. We'd like some advice about this foreign proceeding. Can we send you some documents, look at them, and give us some advice about how these might be used in a proceeding in Germany? And then the documents are in the custody of the U.S. firm, but when the request for them is made, it's clear that they would be privileged under German law and that, in that case, the touch base test might say this doesn't really touch base with the United States. The firm was retained for advice about this German proceeding, and nothing was generated here. And you would distinguish that case from the present one where a U.S. litigation is contemplated and a U.S. firm is retained. Very much so, Your Honor. Yes. And I think many parallels have been drawn today between the Kuyvel case and this case. But no circuit court, and correct me if I'm wrong, this touch base test has not been discussed by us in a published opinion, and it hasn't been discussed by any other circuit as a way to evaluate legally applicable privilege. I agree, Your Honor. This has not been established. It has been utilized in the district courts. I believe it was utilized in a case in the district court which this court affirmed and I think specifically said based substantially on the decision of the lower court and the well-reasoned decision of the lower court, something to that effect. But no court, no appellate court has ever directly addressed 1782 for use and legally applicable privilege insofar as touch bases. And finally, can I just ask you to address the finality very briefly? I see we're over time. But your adversary argues that the Seventh Circuit's decision in Biomet is extremely useful on that issue. So how would you distinguish it? Your Honor, I think you have to look at where Judge Kestel left off and where he resumed on December the 8th as compared to the Biomet case. He had made no determination as to attorney work product privilege. This wasn't a function of just maintaining jurisdiction over the documents and reviewing particular documents, et cetera. He had not made any finding yet as to whether or not, for instance, Mangouris established the requirements of Rule 26, whether we established that the documents were otherwise discoverable, whether production of the documents or whether there would be undue hardship if he had to obtain the documents elsewhere and that there was a substantial need for these documents. That finding did not occur until December the 8th. But the appeal was filed on November the 3rd. So a critical, important element of the case, meaning the parameters of the legally applicable privilege, had not been established by the Court. No ruling had been made by that, and it wasn't made until December the 8th. So that the appeal was premature because the November 30 opinion was not completely or sufficiently final as to satisfy the Chevron test, and it was not as if this was just a continuation or finalization, formalization of a prior order where you might incorporate a subsequent decision. And just making sure I understand the record, it's about a third of the documents had to be evaluated for work product privilege. About a third of the first tranche of documents, and thereafter we had multiple other tranches which came back, but a third of the first tranche of production. That has all been resolved at this point, but it was resolved after the notice of appeal. Much after the notice of appeal, yes. Much after, yes, I understand that. Yes, Your Honor. Thank you. Your Honors, Mr. Tissell's point about this is going to sweep so broadly that it's going to engulf any conceivable privilege is a little bit overstated. What we're talking about is any legally applicable privilege. We are acting on behalf of the Spanish government in our capacity as counsel, and they have entrusted us to not only pursue litigation in the United States, but there's parallel proceedings going on. There's proceedings going on in Spain. There's proceedings going on in the United States. And I think that the specter that all of this raises is exactly what this Court expressed concern about in Kyobel, that when you're in this situation as a law firm in the United States dealing with foreign clients, I mean, most law firms don't have, like, physical files anymore. We've got them all electronically. You could come to me and say, come to me in New York and say, well, your Paris office is doing this case. We want to get the documents. And this is going to chill communications between attorney and client when foreign clients need U.S. lawyers to advise them. But for all the reasons that we've explained, particularly on the touch base question, that simply does not apply here in light of the statutory requirement for the privilege. Because their conceptualization of this is all we have to do is have dueling affidavits on the privilege, and then the district court has to throw up their hands and say, I can't resolve this. I mean, that's not honoring the statutory intent of this provision. So, Your Honors, unless there's any further questions, we'd respectfully request that this Court reverse. I'd like to ask something else about finality. Sure. Has the time for appeal expired with respect to the district court's determination on the work product issues that were left open after the judgment? Your Honor, I think the answer to that is yes, because the December order, you know, the 30 days has lapsed. But if you take their view of finality, and it's this, you know, we never know when there's finality, then arguably no. And I think our view is, because you would never know, you would never know when there was actually a final order in a 1782 situation where you have ongoing proceedings. Because, again, like if they come to us tomorrow and say, hey, you failed to produce this document, we get into dispute about it, then we have to go to the judge. That's a different kind of thing on an issue that was being disputed before the judgment was entered and which had not been resolved by the time the judgment would still remain to be resolved after the judgment was entered, which ordinarily would mean it's a non-final order, as distinct from some kind of administrative problem that arose after the judgment. But one of the things I'm thinking about is that all of those problems with respect to the open work product questions at the time of the judgment could have been resolved at the time and perhaps could still be resolved subsequently so as to eliminate any doubt by a Rule 54B certification by the district court in which the district court says there should be appeal from those matters that are finally resolved, as there's no good reason to delay them pending the resolution of the remaining ones. And I'm wondering whether we should take steps or you or the litigants should take steps to have the district court do that retroactively. I mean, it seems to me with a certain amount of lawful abracadabra that could easily be eliminated from the case. Well, I think the important point, Your Honor, is that the district court resolved all of the 1782 issues in the October order. The only thing left open was U.S. work product. So we had lost all of those issues in October. Yes, but that's, I mean, that is ordinarily, that kind of thing you're saying is very frequently the case on appeals that we bounce because they're not final. The district court will have resolved everything that relates to the matters being appealed, but it wasn't a final order because there were other matters that hadn't been resolved. But respectfully, Your Honor, I think those are situations that are not 1782. In 1782, because of its unique scenario, courts have recognized that we have to have a more pragmatic finality doctrine with that because otherwise, again, that's the Biomec case. The party waited. They waited until the court issued a few more orders, and then the Seventh Circuit said you're out of time for those first few orders. I mean, that's the predicament that we as counsel are in. When we get an order that says you lose, we need to appeal that order, Your Honor. In the 54B scenario, I'm not sure that 54B. You're the one who's saying that the appeal is timely and should proceed. Absolutely. So how would you be harmed if your position were strengthened by getting perhaps unnecessary but nonetheless harmless 54B orders saying if there's a doubt about this, the appeal is with respect to matters that were decided, and there's no reason for delay in the appeal of those? I'm just not sure how 54B overlays on 1782 because there's no claims before the court. I mean, this is all a discovery request. There's not like a pleading with seven counts, and you say, well, we've resolved three counts. Those can go up on appeal. I'm not aware of any court that's dealt with 54B in the 1782 context. Our point – I'm sorry. A request under 54, a demand under 54B, a petition for disclosure of documents, that's what's being – that's what the claim is. The claim is seeking the disclosure of documents. It's very much like a complaint seeking an injunction. It's asking for the court to order certain things to be done. And I suppose what I would say is we don't believe that's necessary based on this court's case law in the 1782 context, and we believe that the biomet decision from the Seventh Circuit is fully consistent with that in applying the more pragmatic view of finality in the scenario with 1782. Your Honor, thank you for your time. We appreciate it.